**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SOPHIA MARTINEZ, ERNESTO VALENZUELA, III, EAST END ON THE BAYOU COMMUNITY ASSOCIATION, RESERVE AT EAST END PROPERTY OWNERS ASSOCIATION, and ALAN ATKINSON | § § § § § § § | |
| v. | § § | Civil Action No. _____ |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and SCOTT TURNER, in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT | § § § § § § § § | **JURY TRIAL DEMANED ON ALL ISSUES SO TRIABLE** |
| Defendants | § | |

## COMPLAINT

Plaintiffs Sophia Martinez, Ernesto Valenzuela, III, East End on the Bayou Community Association, Reserve at East End Property Owners Association, and Alan Atkinson complain of Defendants the United States Department of Housing and Urban Development ("HUD") and Scott Turner in his official capacity as Secretary of the United States Department of Housing and Urban Development (the "Secretary") and seeks relief as follows.

## INTRODUCTION

1.     This is an Administrative Procedure Act case about HUD's acts and omissions with respect to a public housing project that is built on and surrounded by toxic waste sites and that would not have been built but for HUD's violation of its own regulations, arbitrary and capricious actions, and abuses of discretion.  As Mayor Whitmire stated:

> I'm strongly of the opinion that it should never have been built, would not have been built except for conflicts of interest.

1

\*        \*        \*

No one should have ever approved the Middle Street project.

Fox 26, *Houston mayor reacts to suspended Middle Street low-income housing project* (November 20, 2024); ABC 13, *City of Houston moves forward with housing complex near toxic ash site* (January 14, 2026).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question).  Plaintiff has a right to bring this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(e)((1)(B) because a substantial part of the events or omissions giving rise to the claim occurred in this district and a substantial part of property that is the subject of the action is situated in this district.

## PARTIES

3.      Plaintiff Sophia Martinez is an individual resident of Harris County, Texas.  She owns a home and lives in the immediate vicinity of the project that is the subject of this lawsuit.

4.      Plaintiff Ernesto Valenzuela, III, is an individual resident of Harris County, Texas.  He owns a home and lives in the immediate vicinity of the project that is the subject of this lawsuit.

5.      Plaintiffs East End on the Bayou Community Association and Reserve at East End Property Owners Association are Texas non-profit corporations formed to promote for the benefit of homeowners and residents the maintenance, administration, and preservation of properties within two subdivisions in the immediate vicinity of the project that is the subject of this lawsuit.

6.      Plaintiff Alan Atkinson is an individual resident of Harris County, Texas.  He owns substantial real estate in the immediate vicinity of the project that is the subject of this lawsuit and

2

has devoted substantial resources to development and improvement of the public hike and bike trails in that area.

7.    Defendant United States Department of Housing and Urban Development is a Cabinet-level agency of the United States of America.

8.    Defendant Scott Turner is sued in his official capacity as Secretary of the United States Department of Housing and Urban Development.  As Secretary, Mr. Turner has ultimate responsibility for HUD's actions and failures to act.

## STATUTORY BACKGROUND

**Administrative Procedure Act ("APA")**

9.    Pursuant to the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702.  "Agency action" is defined to include not just affirmative agency action but also the "failure to act," *Id*. § 551(13).

> "[I]t is elementary that an agency must adhere to its own rules and regulations. *Ad hoc* departures from those rules, even to achieve laudable aims, cannot be sanctioned."

*Texas v. EPA*, 829 F.3d 405, 430 (5th Cir. 2016), quoting *Reuters Ltd. v. FCC*, 781 F.2d 946, 950 (D.C. Cir. 1986).

> It is well settled that an Executive Agency of the Government is bound by its own regulations, which have the force and effect of law, and the failure of an agency to follow its regulations renders its decision invalid.

*Gulf States Manufacturers, Inc. v. N.L.R.B.*, 579 F.2d 1298, 1308 (5th Cir. 1978).

> We therefore "will not hesitate to overturn agency action as arbitrary and capricious if the agency fails to 'comply with its own regulations.'"

*Neumann's Pharmacy, L.L.C. v. DEA*, 167 F.4th 320, 327-28 (5th Cir. 2026), quoting *Nat'l Biodiesel Bd. V. EPA*, 843 F.3d 1010, 1018 (D.C. Cir. 2016) (quoting *Environmental, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011)).

**HUD Prohibition on Choice Limiting Activities ("CLA")**

10.     HUD regulations have choice limiting activity provisions that preclude the commitment of funds to a project until the Request for Release of Funds ("RROF") and the certification of compliance with the National Environmental Policy Act of 1969 for the project have been approved by HUD.  The general regulation states:

> **Neither a recipient nor any participant in the development process**, including public or private nonprofit or for-profit entities, or any of their contractors, **may commit HUD assistance under a program listed in § 58.1(b) on an activity or project** until HUD or the state has approved the recipient's RROF and the related certification from the responsible entity. In addition, until the RROF and the related certification have been approved, **neither a recipient nor any participant in the development process may commit non-HUD funds on or undertake an activity or project** under a program listed in § 58.1(b) if the activity or project would have an adverse environmental impact or limit the choice of reasonable alternatives.

24 C.F.R. § 58.22(a) (emphasis added).  The regulation applicable to projects involving Project-Based Vouchers ("PBVs") states:

> When an environmental review is required, a PHA may not execute an Agreement or HAP contract with an owner, and the PHA, **the owner, and its contractors may not acquire, rehabilitate, convert, lease, repair, dispose of, demolish, or construct real property or commit or expend program or local funds for these activities**, until one of the following occurs:
>
> (2) The responsible entity has completed the environmental review procedures required by 24 CFR part 58, and HUD has approved the PHA's Request for Release of Funds and Certification (form HUD-7015.15). HUD approves the Request for Release of Funds and Certification by issuing a Letter to Proceed or form HUD-7015.16, thereby authorizing the PHA to execute an Agreement or HAP contract, as applicable.

24 C.F.R. § 983.56(d)(2) (emphasis added).  Further:

4

HUD **will not** issue a Letter to Proceed or form HUD-7015.16 to the PHA or provide environmental clearance if the PHA, the owner, or its contractors have undertaken any of the activities described in paragraph (d) of this section.

24 C.F.R. § 983.56(e) (emphasis added). In addition:

In cases in which HUD has approved a certification and RROF but subsequently learns (e.g., through monitoring) that the recipient violated § 58.22 or the recipient or responsible entity otherwise failed to comply with a clearly applicable environmental authority, **HUD shall** impose appropriate remedies and sanctions in accord with the law and regulations for the program under which the violation was found.

24 C.F.R. 58.72(c) (emphasis added).

**HUD Environmental Policy**

11.    HUD regulations make it clear that public housing should not be built on or adjacent to toxic waste sites:

**(i)** Also, it is HUD policy that all properties that are being proposed for use in HUD programs be **free of hazardous materials, contamination, toxic chemicals and gases, and radioactive substances**, where a hazard could affect the health and safety of occupants or conflict with the intended utilization of the property.

**(ii)** The environmental review of multifamily housing with five or more dwelling units (including leasing), or non-residential property, **must include the evaluation of previous uses of the site or other evidence of contamination on or near the site,** to ensure that the occupants of proposed sites are not adversely affected by any of the hazards listed in paragraph (i)(2)(i) of this section.

**(iii) Particular attention should be given to any proposed site on or in the general proximity of such areas as dumps, landfills, industrial sites, or other locations that contain, or may have contained, hazardous wastes**.

24 CFR § 58.5(i)(2) (emphasis added).

(1) It is HUD policy that all property proposed for use in HUD programs be **free of hazardous materials, contamination, toxic chemicals and gasses, and radioactive substances,** where a hazard could affect the health and safety of occupants or conflict with the intended utilization of the property.

(2) HUD environmental review of multifamily and non-residential properties shall include **evaluation of previous uses of the site and other evidence of contamination on or near the site**, to assure that occupants of proposed sites are not adversely affected by the hazards listed in paragraph (i)(1) of this section.

5

(3) **Particular attention should be given to any proposed site on or in the general proximity of such areas as dumps, landfills, industrial sites or other locations that contain hazardous wastes**.

24 CFR § 50.3(i) (emphasis added).

**National Environmental Policy Act ("NEPA")**

12.    NEPA requires federal agencies to assess the environmental effects of their proposed actions prior to making decisions.  In enacting NEPA, Congress recognized the importance of "maintaining environmental quality to the overall development and welfare of man." 42 U.S.C. § 4331(a).  NEPA sets forth the responsibilities of the Federal Government in  this respect, which include the responsibilities to:

assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings; and

attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences.

42 U.S.C. § 4331(b)(2) and (3).  Thus, for environmental assessments, NEPA requires federal agencies to consider the impact of their projects on the people around them - "the quality of the human environment" -  as well as the impact of their projects on the earth environment.  42 U.S.C. § 4336(b)(2).

## FACTS

13.    HUD is a Cabinet-level agency that administers the federal housing laws.  HUD gives federal funds to local Public Housing Agencies for their affordable housing programs, including the Housing Choice Voucher and Project Based Voucher programs, commonly known as Section 8 housing.

14.    The Houston Housing Authority ("HHA") is a Public Housing Agency created by the Houston City Council under the U.S. Housing Act of 1937 and enabling state legislation.  It is

6

charged with providing decent, safe and sanitary housing for low to moderate income families and individuals.

15. The NRP Group ("NRP") is a group of companies based out of Ohio and involved in all phases of real estate development, construction, and property management, with a substantial focus on multifamily affordable housing.

16. Clayton Homes, located at 1919 Runnels, Houston, Texas 77003, was one of HHA's public housing complexes, just south of the interchange of Interstates 10 and 69, consisting of 296 units. Hurricane Harvey severely damaged 112 of those units in 2017. That same year, the Texas Department of Transportation ("TXDOT") expressed interest in acquiring the Clayton Homes property for its freeway expansion project.

17. Beginning in March 2018, HHA and NRP agreed to develop low-income housing on a proposed site in East Downtown ("EaDo") Houston. From the beginning, HHA and NRP planned to develop this low-income housing using the proceeds from HHA's disposition of Clayton Homes via sale to TXDOT.

18. On November 20, 2018, NRP entered a Purchase Contract to acquire real property east of downtown Houston ("EaDo"), less than a mile from Clayton Homes, consisting of three tracts: 21.68 acres (Tract 1), 5.12 acres (Tract 2), and 1.7 acres (Tract 3) as reflected on Exhibit A. The interested parties referred to this property as the "EaDo 800" property and later as the "800 Middle Street" property and referred to their project as the "EaDo 800" project, "800 Middle Street" project, "EaDo 800 Lofts," and ultimately the Pointe at Bayou Bend.

19. The property that NPR agreed to purchase is bordered on the east side by the Lead Products Company Superfund Site and the abandoned and non-remediated City of Houston Velasco Incinerator Site. For decades, the incinerator generated toxic ash with multiple

contaminants such as arsenic, barium, cadmium, and lead far exceeding amounts allowed for human contact.  A map of the area is attached as Exhibit A.

20.     In June 2019, HHA designated NRP as the Developer of the EaDo 800 project.  In doing so,  HHA specifically tied the project to the funds that it would receive from TxDOT for Clayton Homes.

21.     On July 16, 2019, the HHA board authorized HHA to accept an assignment from NRP of the Purchase Contract for the EaDo 800 property to the HHA.  In seeking approval for this assignment, HHA only disclosed Tract 1, excluding any reference to Tract 2 and Tract 3, although the Purchase Contract was for all three tracts.  HHA went to great pains to give only a vague description of the property so that its location could not be ascertained, ultimately leading to an injunction under the Texas Open Meetings Act that required HHA to identify the location through ratifying resolutions.

22.     On August 5, 2019, NRP's attorney advised NRP that structures could not be built on Tract 2 or Tract 3, described as "fly ash" tracts,  due to environmental concerns.  With respect to Tract 1, Tract 2, and Tract 3, he advised:

> Finally, due to the uncertainties that remain, **NRP does not recommend that the Houston Housing Authority ("HHA") risk any non-refundable earnest money** until additional environmental review and due diligence can be completed.

Exhibit B (emphasis added).

23.     Also on August 5, despite the warnings from NRP's attorney, HHA entered into an Assumption Agreement whereby NRP assigned HHA the Purchase Contract for the EaDo 800 property and HHA reimbursed NRP for $150,000 in earnest money that NRP had already paid to the seller.  That $150,000 became non-refundable later in August.

24.    On August 19, 2019, HHA told HUD that it had a parcel of land under contract to replace "a bulk" of the Clayton Homes units and needed to know if HUD would approve the Clayton Homes disposition in time for HHA to use the proceeds from TxDOT to close that purchase by October 3.  Exhibit C.  The land under contract was the EaDo 800 property.

25.    On August 29, 2019, HHA and TxDOT entered into an agreement for TxDOT to purchase the Clayton Homes property for $90,000,000 subject to HUD approval.

26.    On September 4, 2019, NRP advised HHA that Tract 2 "requires permission from TCEQ to disturb the surface," and Tract 3 "is off limits" and "has contamination issues."  Exhibit D.  With respect to Tract 1, although NRP believed it to be developable, NRP advised:

> However, is should be noted that residual contamination does remain present on this portion of the project area.

Exhibit E.  Further, with respect to Tract 3, NRP told HHA:

> The northeast tract (1.658 acres – former unauthorized landfill site) appears to contain significant contamination issues which remain unresolved.  This tract of land is not suitable for any type of development at this time.  Future owners of this property should completely understand the unresolved environmental issues and potential long term liability concerns associated with this tract.  NRP requests to be excluded from any potential ownership interests in this tract.

Exhibit E.  Ultimately, Tract 3 was removed from the sale due to its toxic contamination.

On September 17, 2019, HHA once again confirmed publicly that it would be using the proceeds from the sale of Clayton Homes to build new units on the EaDo 800 property. By September 26, 2019, HHA had paid the seller of the EaDo 800 property $300,000 that was non-refundable.

27.    On October 1, 2019, HHA entered the Sixth Amendment to the Purchase Contract with the seller of the 800 Middle Street property under which it committed to pay and did pay to the seller an additional $1,500,000 in non-refundable earnest money on or about October 4, 2019.

9

28.     At its October 15, 2019, board meeting, HHA once again confirmed its intention to use the funds from the sale of Clayton Homes to develop housing on the EaDo 800 property.

29.     At its November 26, 2019, board meeting, HHA approved Resolution Nos. 3116 and 3117, in which it ratified its prior Resolution No. 3063 authorizing a Memorandum of Understanding with NRP to develop the EaDo 800 property, now referred to as 800 Middle Street, and its prior Resolution No. 3074 authorizing the acquisition of that property.  Again, HHA confirmed its intention to use the proceeds from the sale of Clayton Homes for this acquisition.

30.     On December 2, 2019, the HHA board authorized HHA to apply to HUD for approval of the disposition of Clayton Homes by selling it to TXDOT.  In its application, HHA advised HUD that it intended to use the proceeds from the sale to develop Project Based Voucher ("PBV") units.  These are among the units that HHA planned to develop on the 800 Middle Street property.

31.     On December 10, 2019, HUD approved HHA's application for the disposition of Clayton Homes.  As to the proposed use of the proceeds, which were federal funds, HUD stated:

> HUD determined that HHA's proposed use of proceeds meets the applicable requirements; however, due to a lack of specific acquisition and development plans, use of proceeds for acquisition of PBV units is not approved at this time.  HHA must request and receive a separate written approval from the SAC to expend the proceeds for an authorized use in accordance with all applicable requirements.

Exhibit F.  On December 11, 2019, HUD advised HHA:

> Please note that in the Conditions Section of the letter – before you expend proceeds please notify the Special Applications Center via an Amendment Request with the details of what you are acquiring or expending the funds for.  The uses you have mentioned to date, are eligible uses, but to keep the Federal Record updated – please send a formal Amendment Request with a supporting Board Resolution on what you are intending to use the funds for and we will send back a quick amendment to this approval.

Exhibit G.  HUD further advised HHA:

10

> I want to insure that there isn't any confusion as to what regulatory requirements are in effect for the new development projects that you have on the horizon that will be utilizing PBVs.

Exhibit H.  On that same day, HHA responded:

> This is an amendment request to purchase 800 middle street.  I've attached the resolution that has HHA assuming the purchase contract and the resolution with NRP to develop the first phase which will be approximately 400 units of LIHTC units with PBV's.

Exhibit F.  HHA provided Resolution Nos. 3074, passed on July 16, 2019, and 3116, relating to the acquisition and development of 800 Middle Street.  Exhibit I; Exhibit J.

32.    On December 12, 2019, HUD learned of environmental concerns about the 800 Middle Street property and questioned HHA about them.  With respect to Tract 2 and Tract 3, HHA responded: "We've been open and upfront that 6 acres would not be usable/buildable and the plan is to donate it to the Buffalo Bayou Preservation folks."  Exhibit K.  HHA then provided to HUD a Voluntary Cleanup Program Certificate of Completion from the Texas Commission on Environmental Quality ("TCEQ") dated April 11, 2016, for the 5.12-acre Tract 2.  HHA did not provide any information showing that the post-response conditions of the COC had been satisfied. HHA did not provide any environmental information regarding the 1.7-acre Tract 3.  Internally, HUD observed:

> Frankly, Houston is a big city other lots are available without contamination history.  Six acres are not in dispute- and children don't always reads signs . . .

Exhibit K.

33.    On December 13, 2019, HHA published Resolution No. 3131 clarifying that its prior authorizations to purchase the 800 Middle Street property included all three tracts – Tract 1 (21.680 acres), Tract 2 (5.12 acres), and Tract 3 (1.7 acres), and confirming once again its intention to use the  Clayton Homes proceeds to purchase the property.

11

34.     On December 19, 2019, HHA entered the Ninth Amendment to the Purchase Contract whereby it committed to pay and did pay to the seller of the 800 Middle Street property a $25,000 "closing extension fee."

35.     On January 29, 2020, HUD inquired of HHA as to how much money it had spent on 800 Middle Street and the source of those funds.  HUD stated:

Reminder HUD has not approved purchase of this property with federal funds. Exhibit L.  On February 4, 2020, HHA advised HUD that it had spent $1,825,000 to date and that the source of funds was business activity from APV Redevelopment.  Exhibit L.  APV Redevelopment is an affiliate of HHA that often makes short-term loans to HHA.

36.     Effective February 13, 2020, HHA entered the Ninth Amendment to the Purchase Contract whereby it committed to pay to the seller of the 800 Middle Street property an additional $400,000 as a non-refundable extension fee to extend the closing date of the Purchase Contract to May 15, 2020.

37.     On April 3, 2020, HUD conditionally approved HHA'a acquisition of the 800 Middle Street property for PBV units contingent and conditioned upon an environmental review.

38.     On April 22, 2020, HHA requested that HUD authorize it to use the proceeds from the Clayton Homes sale to purchase the 800 Middle Street property to develop 925 units of which 229 would be PBV units.

39.     On August 18, 2020, without any cogent analysis or citation to authority and in an obvious attempt to cover for HHA, HUD's Office of General Counsel issued a determination that HHA had not violated HUD's choice limiting activity regulations despite HHA's substantial contractual obligations and substantial expenditure and commitment of HUD funds to purchase the 800 Middle Street property.

12

40.    NEPA requires an environmental assessment for most federal projects.  Under statute and HUD regulations, a Responsible Entity assumes HUD's obligations to conduct an environmental review as required by NEPA and certify its compliance with NEPA..  For HHA, the City of Houston, through its Housing and Community Development Department ("HCDD"), is the Responsible Entity.

41.    On September 25, 2020, HCDD completed its environmental review for the 800 Middle Street project, now called the EaDo 800 Lofts.  On September 30, 2020, the City published its Combined Notice of Finding of No Significant Impact and Notice of Intent to Request Release of Funds ("FONSI"), advising that it had determined that the EaDo 800 Lofts project would have no significant environmental impact and that it would authorize HHA to request release of the Clayton Homes proceeds and PBVs for the project.  The FONSI contained various mitigation requirements that HHA had to satisfy with respect to the contamination and toxic substances on the property.

42.    Significantly, in its budget breakdown for the project in the FONSI, the City represented that $54,432,261.03 of federal funds from the Clayton Homes proceeds would be used for acquisition of the 800 Middle Street property.  It made no mention of the $1,825,000 that HHA had already spent and no mention of APV Redevelopment as a source of funds.  Likely, any funds from APV Redevelopment were a short-term loan to HHA that it always intended to repay with proceeds from the Clayton Homes sale.

43.    On October 26, 2020, the City submitted a RROF for $54,432,261.03 from the proceeds of the Clayton Homes sale proceeds to acquire the 800 Middle Street property.  Again, it made no mention of the $1,825,000 that HHA had already spent and no mention of APV Redevelopment as a source of funds. Thereafter, during the public comment period, HUD received

at least one objection, as allowed by 24 C.F.R. § 58.75(e), that HHA and NRP had violated the choice limiting activity regulations, specifically that they had committed funds, incurred costs, or undertaken activities not authorized before approval of the RROF and environmental certification by HUD. HUD brushed off this objection based on the August 18, 2020, determination by its Office of General Counsel.

44.    On November 20, 2020, HCDD advised that HUD had given a preliminary notification that it might reject the RROF, and the HUD Environmental Regional Office had informed HHA that it might reject the EaDo 800 project. That evening, one of HUD's Assistant Secretaries sent an extraordinary email to her colleagues regarding "Consideration of objections received for EADO 800 Lofts, Houston, TX." She stated:

> The property site is quite complicated. The Valasco (sic) incinerator site is still owned by the City and has not been remedied. **It sits contaminated with a chain link fence around it. The site has ash on the top surface.**
>
> The incinerator site used 2 Burrow Pits, one of which is where the clay cap is being repaired and **the other site has not been remediated nor does it have a fence around it.** It is on the banks of the Bayou. It was taken off the sale of the property because it has not been remediated.
>
> The current clay cap site has extensive erosion into the Bayou and has weakened the entire slope, including where the bike path is. The current owner did not keep current on the maintenance of the clay cap and is now expending over 1.7 million on the repairs. **This liability will be transferred to the housing authority.** The ER states that the property can not (sic) be purchased until the work has been completed. Not completed yet.
>
> **The Valasco (sic) site itself is still owned by the City and has not been remediated nor evaluated for threats to the city. The site should be evaluated to understand the contamination and the threat to air, water, and ground.** The City may be in violation of several regulatory requirements for managing old incinerator sites.
>
> Below are various statements about the site:

14

The site is a former incinerator site that contains toxic materials in certain areas. With respect to site preparation arsenic and lead were detected in the soil (fil) samples at concentrations that exceed the TSBC and health-based PCL.

Lead was detected in a groundwater sample at a concentration that exceeds the groundwater ingestion PCL.

Exhibit M. Incredible. HUD knew that the project site was bordered by the contaminated and non-remediated Velasco Incinerator Site and the contaminated, non-remediated and unfenced Tract 3 site, that the incinerator site needed to be evaluated for threat to air water, and ground, that lead and arsenic levels in the soil and in the water exceeded those that are safe for humans, and that HHA would assume all liability for the contaminated and remediation-in-progress Tract 2 site. If it is a threat to air, water and ground on one side of the chain link fence, it is a threat on the project side too. Of course, HUD also knew that this whole dumpster fire of an environmental nightmare was a threat to the City.

45.    Despite its reservations and what it knew, HUD issued its Authorization for Use of Grant Funds ("AUGF") to HHA on December 8, 2020, with respect to the $54,432,261.03 to purchase the 800 Middle Street property. HHA closed the purchase of Tract 1 on December 30, 2020.

46.    With respect to Tract 2, HCDD informed HHA at that time that TCEQ's approval of the requisite environmental remediation for Tract was a condition of the AUGF that must be satisfied before HHA could acquire the property. HHA completely ignored this requirement and closed the purchase of Tract 2 on February 1, 2021, without the TCEQ approval. A few days later, without knowledge that HHA had already purchased Tract 2, HUD advised HHA once again that HHA could not purchase Tract 2 until it received TCEQ approval of the remediation. Indeed, HHA had not even completed the remediation and continued with remediation work on Tract 2 for several months thereafter.    On July 2, 2021, HUD learned that HHA had closed on the 5.12-

acre Tract 2 without obtaining a Texas Commission on Environmental Quality ("TCEQ") approval/final letter.  Finally, on July 12, 2021, TCEQ issued a letter confirming HHA's completion of the mitigation but requiring HHA to issue annual inspection reports. HUD took no action despite HHA's blatant disregard for the condition in the AUGF for the purchase of Tract 2.

47.    In December 2022, as HHA and NRP had been warned countless times since almost the beginning of the project, their construction activities on Tract 1 uncovered substantial toxic ash deposits.  Nonetheless, HHA and NRP continued their activities through most of 2023 without self-reporting or proper remediation.  Then, on September 13, 2023, TCEQ issued four violations to HHA related to Tract 1: failure to maintain documentation of sampling for hazardous waste; failure to have a representative sample of the ash waste pile; failure to provide notification of ash uncovered during construction; and failure to ensure prevention of an imminent discharge of industrial solid waste.  Subsequently, TCEQ fined HHA $175,000 for its violations.

48.    On July18, 2024, HHA reported to TCEQ that it had uncovered another deposit of toxic ash at a different location on Tract 1.  This prompted Mayor Whitmire to halt the project the following day.  On October 24, 2024, HUD Office of the Inspector General executed a search warrant on the 800 Middle Street property to take soil samples and borings.

49.    Mayor Whitmire was right.  The project should never have been built.  It is still bordered by the contaminated Tract 2 to the West and the contaminated Superfund, Velasco Incinerator, and Tract 3 sites to the East.  Unfortunately, for reasons that will become apparent, HHA was hellbent on buying the 800 Middle Street property with the Clayton Homes proceeds, and it committed so much money to the project before even submitting the environmental review and certification that the train could not be stopped – or no one had the will to stop it.  Of course, that is the reason for HUD's prohibition on choice limiting activities.  Nonetheless, on January 15,

16

2026, Mayor Whitmire and the HHA announced that the 800 Middle Street Project, now known as the Pointe at Bayou Bend, would begin accepting applications for leasing, and HHA opened its PBV waitlist for the project on February 27. 2026.  Of course, the threat to the City and liability of the HHA remains.

## CLAIMS

50.    From the inception of the 800 Middle Street project, HHA planned to purchase the property with the proceeds from the disposition of Clayton Homes.  The 800 Middle Street project and the proceeds from the sale of Clayton Homes have always been inextricably intertwined. Those proceeds were always federal funds, and the project was always a federal project.

51.    HHA violated the choice limiting activity prohibitions of 24 C.F.R. § 58.22(a) and 24 C.F.R. § 983.56(d)(2) by, among other things, entering binding contracts and committing and spending substantial non-refundable federal and/or non-federal funds to purchase the 800 Middle Street property.

52.    The requirements of 24 C.F.R. § 983.56(e) that HUD **will not** issue a Letter to Proceed or AUGF if there are choice limiting activities violations and of 24 C.F.R. § 58.72(c) that HUD **shall** impose remedies and sanctions for choice limiting activities violations are not discretionary or ambiguous.

53.    By approving the purchase of 800 Middle Street, authorizing the use of Clayton Homes proceeds for that purchase, releasing the Clayton Homes proceeds, approving the construction of PBV units for the 800 Middle Street project, approving and funding the PBVs for the 800 Middle Street project, accepting the RROF and certification for the 800 Middle Street project, issuing a Letter to Proceed for the 800 Middle Street project, issuing an AUGF for the 800 Middle Street Project, and failing to impose remedies and sanctions on HHA, HUD has violated

17

24 C.F.R. § 983.56(e) and 24 C.F.R. § 58.72(c). These actions by HUD were and are arbitrary, capricious and not in accordance with law. Further, HUD's action in determining that HHA did not commit choice limiting activity violations was arbitrary, capricious, an abuse of discretion, and not in accordance with law.

54.    Ms. Martinez and Mr. Valenzuela live and own their homes in the immediate vicinity of the project. The members of the East End on the Bayou Community Association and Reserve at East End Property Owners Association likewise live and own homes in the immediate vicinity of the project. Those associations exist to maintain, administer, and preserve their members' properties and the subdivisions in which they are located. Mr. Atkinson owns substantial real property in the immediate vicinity of the project and has committed substantial resources to the development and improvement of the neighborhood for the benefit of himself and the public. As a result of the development of the project and HUD's acts and omissions described herein, Plaintiffs and their constituents have sustained and will sustain harm to the use, enjoyment and value of their property through, without limitation, increased traffic density, traffic and parking congestion, environmental pollution, and loss and diminution of their property value and, for the individual plaintiffs, through the expenditure of their tax dollars in violation of law. The project adversely affects the environmental, recreational, cultural, and aesthetic qualities of the neighborhood. But for HUD's acts and omissions, the project would not have been built, and Plaintiffs would not have suffered these injuries.

## RELIEF REQUESTED

55.    Plaintiffs request that the Court hold unlawful, set aside and vacate HUD's Letter to Proceed and AUGF with respect to the Project (interchangeably known as EaDo 800 Lofts, 800 Middle Street, EaDo 800, and the Pointe at Bayou Bend), specifically, but without limitation, with

18

respect to the release of $54,432,261.03 of proceeds from the sale of Clayton Homes for the purchase of the real property, the approval, grant, issuance and funding of PBV vouchers, any other financial contributions to or for the benefit of the Project, and all subsidiary actions enveloped in the Letter to Proceed and AUGF as set forth previously.

56.     Since no HUD funds should have been used for any aspect of the Project, Plaintiffs request that the Court enjoin, temporarily and permanently, HUD and the Secretary from using any HUD funds, specifically or generally, for the benefit of the Project, including funds for the issuance, grant, and/or payment of PBV vouchers for the Project and the leasing of PBV units for the Project.  Given HUD's derogations of its legal obligations with respect to the Project, whether careless, reckless or intentional, its support for and involvement in the Project must cease for Plaintiffs to have full relief for the injuries sustained.

57.     Plaintiffs request that the Court enjoin HUD and the Secretary from approving, permitting, allowing, and/or facilitating leasing of units in the Project under HUD's PBV program.

58.     Plaintiffs request that the Court set aside and vacate the determination of HUD's OGC that HHA did not violate the prohibitions against choice limiting activities with respect to the Project.

59.     Plaintiffs request that the Court compel  HUD to impose remedies and sanctions on HHA as required by statute, including, without limitation, those remedies and sanctions available under 24 C.F.R. § 941.501 and including, without limitation, seeking recapture and recoupment of the proceeds from the sale of Clayton Homes and all other funds and benefits expended by HUD on the Project.

60.     Plaintiffs request that the Court them all other relief to which they may be entitled, whether by means of vacatur, injunction, declaration or other remedy available under law.

19

## ATTORNEYS' FEES

61.     Plaintiffs request an award of attorneys' fees and costs as allowed by 28 U.S.C. §

2412 and any other statute under which they may be awarded.

Plaintiffs request that the Court grant them the relief requested herein and all other relief

to which they are entitled.

Respectfully submitted,


By:     */s/ John L. Dagley*
        JOHN L. DAGLEY
        State Bar No. 05310050
        **BUCK KEENAN LLP**
        2229 San Felipe, Suite1000
        Houston, Texas 77019
        (713) 225-4500
        (713) 225-3719 (fax)
        jdagley@buckkeenan.com

        **ATTORNEY IN CHARGE FOR
        PLAINTIFFS**